**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CR No. 07-89ML** |
| | : | |
| | : | |
| **LARRY W. CRITES** | : | |

**GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANT'S OBJECTION TO PRE-SENTENCE REPORT**

In his "Objection to Pre-Sentence Report", the defendant makes two principal arguments. First, he contends that he is entitled to a downward adjustment in offense level pursuant to Sentencing Guidelines Section 3B1.2 because he played only a "minor role" in the Travel Act offense (18 U.S.C. § 1952(a)(3)) of which he now stands convicted. Second, he contends that his offense level should be two points lower because the most analogous federal offense to the state extortion charge underlying his Travel Act conviction, which governs the applicable offense level, is not 18 U.S.C. § 894, collection of an extension of credit by extortionate means, but rather obstruction of commerce by extortion, i.e., the Hobbs Act, 18 U.S.C. 1951. He is wrong on both counts.

**FACTS**

On Thursday, April 6, 2006, Anthony St. Laurent, James Manning, Ricky Silva and others met at St. Laurent's home in Johnston, Rhode Island. The defendant did not attend this

meeting. During the meeting, St. Laurent directed Manning to lead Silva from Rhode Island to Massachusetts to meet the defendant, whom Silva did not know. According to St. Laurent's instructions, once Manning had introduced the defendant and Silva to one another, the defendant and Silva would locate and extort money from two Massachusetts men whom Saint Laurent claimed owed him money.

That same night, Manning and Silva left St. Laurent's home and drove to Taunton, Massachusetts. Once there, they met with the defendant in the parking lot of a doughnut shop. Manning introduced Silva to the defendant. The men confirmed that, according to St. Laurent's instructions, there were two men from whom money was to be collected. The defendant stated that to find one of the intended extortion victims, they needed to go to a particular bar in Raynham, Massachusetts. Manning stated that the defendant had to go into the bar to locate this intended victim because Silva didn't know who he was. The defendant agreed. During the conversation, the defendant cautioned against approaching the other intended extortion victim because that intended victim would report them to law enforcement. Silva responded, "All right. Let's go get the other guy," referring to the first intended extortion victim.

Subsequently, the defendant and Silva attempted to find the first intended extortion victim at two separate locations in

Massachusetts, while Manning returned to Rhode Island. During these attempts, the defendant repeatedly expressed his concern that if they approached the other intended extortion victim, that intended victim would report them to police. Ultimately, the attempts by the defendant and Crites to locate the first intended extortion victim were unsuccessful.

## ARGUMENT

### I. THE DEFENDANT PLAYED A CRITICAL, NOT A "MINOR", ROLE IN THE OFFENSE.

United States Sentencing Guideline Section 3B1.2 provides that a defendant's offense level may be reduced by two levels if he was "a minor participant in any criminal activity," and by three levels if the defendant's role in the offense is less than "minor", but more than "minimal." "In seeking a [S]ection 3B1.2 adjustment, a defendant 'has the burden of proving that he is both less culpable than most others involved in the offense of conviction and less culpable than most other miscreants convicted of comparable crimes.'" United States v. Melendez, 301 F.3d 27, 34 (1st Cir. 2002)(quoting United States v. Ortiz-Santiago, 211 F.3d 146, 149 (1st Cir. 2000))(emphasis added). Application Note 3(C) provides that whether to grant an adjustment under Section 3B1.2 is a "[f]act-[b]ased [d]etermination".

The defendant claims that he is entitled to a downward adjustment for minor role in the offense because: (1) it was the other men involved in the extortion scheme, not he, who physically crossed state lines; and (2) the other men involved in the extortion scheme contacted him, not the other way around, and he directed the other men away from one of two intended extortion victims. Unfortunately for the defendant, the rose does not smell quite so sweet.

First, whether or not the defendant himself physically crossed state lines is as irrelevant to sentencing as it was to whether he committed a violation of the Travel Act.[1] Second, the

[1] It is well-established that where a defendant, like the defendant here, aids and abets the underlying unlawful activity, that defendant violates the Travel Act, notwithstanding that he himself did not travel interstate. E.g., United States v. Stott, 245 F.3d 890, 909 (7th Cir. 2001)(non-traveling defendant liable as aider and abettor under Travel Act where evidence established that defendant had the state of mind required for underlying travel Act offense "and took some action intended to make the endeavor succeed...; it was not necessary for the Government to show that [defendant] induced or even had knowledge of [co-defendant's] interstate travel"); United States v. Sigalow, 812 F.2d 783, 785, 786 (2d Cir. 1987)("an aider and abettor of a Travel Act violation need not have assisted in the use of interstate facilities"; government not required to "prove that [defendant] aided and abetted, or had knowledge of the jurisdictional element of the Travel Act offense"). See also United States v. Houlihan, 92 F.3d 1271, 1292 (1st Cir. 1996)(for purposes of interpreting the murder for hire statute, 18 U.S.C. § 1958, "it is entirely appropriate to look to case law construing the Travel Act", and "if the government proves that one of the participants used the telephone or some comparable interstate facility in furtherance of the scheme, then the required facilitative nexus is established as to all participants").

facts simply belie the defendant's claim of having played a minor role. There were four men principally involved in the extortion scheme: St. Laurent, the defendant, Silva and Manning. It is true that the extortion scheme originated with St. Laurent; he identified the targets of the scheme and assigned the roles that the defendant, Silva and Manning would play in it. Yet it was the defendant, Silva and Manning who put the plan into action while St. Laurent remained behind in Johnston, and it was the defendant, along with Silva, who was actually going to use or threaten physical harm in order to induce payment of the money St. Laurent claimed was owed. Indeed, the defendant's own words paint a clear picture of his major role in the offense. He described what he and Silva were going to do to one of the intended extortion victims as follows: "Smack him and grab him, let's go and it's done. You're dealing with the Saint (a reference to St. Laurent) so you're paying now and that's it." The defendant and Silva were the muscle; without them, the plan could not go forward. And while it is true that the defendant advised against approaching one of the intended victims, his own words, captured on tape, make plain that this was not out of any concern for that intended victim, but instead out of concern for his own hide -- he was convinced that this intended victim would report the extortion to law enforcement.

As noted, it is not enough for the defendant to establish that he is less culpable than another participant in the scheme; he must establish that he is less culpable than most of the other participants, and further that he is less culpable than "most other miscreants convicted of similar crimes." United States v. Brandon, 17 F.3d 409, 460 (1st Cir. 1994)(defendant not entitled to minor role adjustment notwithstanding that he was less culpable than major participants in scheme because defendant was "not less culpable than most of the other defendants let alone substantially less culpable than an average defendant.") There is nothing here that distinguishes this defendant from the average defendant convicted of a Travel Act extortion offense. At bottom, he was "a player rather than [] a dabbler" in the extortion scheme. Ortiz-Santiago, 211 F.3d at 149. As such, he is not entitled to a downward adjustment for "minor role" in the offense.

## II. THE DEFENDANT'S BASE OFFENSE LEVEL OF 20, BASED ON 18 U.S.C. § 894, IS PROPERLY CALCULATED.

With respect to the defendant's claim that his base offense level is wrongly calculated, there are several threshold matters about which the government and the defendant agree. First, the government and the defendant agree that because the defendant stands convicted of violating the Travel Act, 18 U.S.C. § 1952(a)(3), Sentencing Guideline § 2E1.2, entitled "Interstate

or Foreign Travel or Transportation in Aid of A Racketeering Enterprise", is the applicable Guideline provision. Second, the government and the defendant agree that, under this Guideline provision, the base offense level is either 6 or the offense level applicable to the underlying unlawful activity with respect to which the travel was taken, whichever is greater. Third, the government and the defendant agree that, because the intended underlying unlawful activity with respect to which the travel was taken was extortion in violation of the Massachusetts extortion statute, pursuant to Application Note 2 to § 2E1.2, "the offense level corresponding to the most analogous federal offense is to be used."

It is here that the government and the defendant part company. The defendant argues that the most analogous federal offense is obstruction of commerce by extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a). According to Appendix A to the Guidelines, Guideline § 2B3.2 applies to Hobbs Act extortion. Under § 2B3.2, the base offense level is 18. The government's view, consistent with that of the Office of Probation, is that the most analogous federal charge is 18 U.S.C. § 894, collection of an extension of credit by extortionate means. According to Appendix A, Guideline § 2E2.1, entitled "Extortionate Extension of Credit", applies to § 894. Under § 2E2.1, the base offense level is 20. It is over this

two-level difference in base offense level that the dispute lies.

The government submits that its position is the better reasoned one. "Section 894(a)(1) makes it illegal to knowingly participate[] in any way, or conspire[] to do so, in the use of any extortionate means . . . to collect or attempt to collect any extension of credit." United States v. Hoyle, 237 F.3d 1, 5 (1st Cir. 2001). The First Circuit has held that an "extension of credit", defined in 18 U.S.C. § 891(1),[2] is "not confined to what is commonly referred to as a 'loan.'" Hoyle, 237 F.3d at 6 (citing United States v. Sedlak, 720 F.2d 715, 720 (1st Cir. 1983) and United States v. DiPasquale, 740 F.2d 1282, 1288 (3d Cir. 1984)). It does not require that the victim believe that he owes money to the person demanding it. Hoyle, 237 F.3d at 6 (citing Sedlak, 720 F.2d at 720). There can be an extension of credit "'even when the victim was forced to sign an agreement to pay a false claim.'" Hoyle, 237 F.3d at 6 (quoting Sedlak, 720 F.2d at 720). The debt or claim "may even be wholly fictitious." Hoyle, 237 F.3d at 6 (citing DiPasquale, 740 F.2d at 1287).

While there is no First Circuit authority directly on point, the Third Circuit has held that § 894 applies in the

[2] Pursuant to 18 U.S.C. § 891(1), "[t]o extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."

context of an extortion scheme precisely like that undertaken by the defendant and his cohorts here. In United States v. DiPasquale, 740 F.2d 1282 (3d Cir. 1984), the defendants presented themselves to the victim, demanded money that they claimed was owed to them, and when the victim refused to pay, beat him up. 740 F.2d at 1285. Upholding the defendant's § 894 convictions, the Third Circuit noted that that "the definition of an extension of credit in section 891(1) was generously drafted," and that the "definition has been even more generously construed." DiPasquale, 740 F.2d at 1288. The Court held that the term "agreement" to defer payment as contained in the definition of "extension of credit" likewise "has not been strictly construed," and thus "[a] tacit agreement may be implied from the circumstances surrounding the creation of the debt." Id. at 1287 n.2., 1287. The Court explained:

> [U]nder section 891(1), an agreement to defer the repayment of a debt may be implied from the debt, even if the debt is wholly fictitious. When a self-styled creditor appears before his "debtor" and demands satisfaction, the creditor posits both a debt and the prior deferral of its repayment. We believe that the definition of an extension of credit encompasses this type of transaction. . . .

740 F.2d at 1287 (emphasis added).

There is authority from other circuits to the contrary, holding that to extend credit means more than merely appearing

before the "debtor" and demanding money. United States v. Boulahanis, 677 F.2d 586, 587, 590 (7th Cir. 1982); United States v. Stokes, 944 F.2d 211, 215 (5th Cir. 1991); United States v. Wallace, 59 F.3d 333, 339-40 (2d Cir. 1995). In Hoyle, however, the First Circuit, in holding that an extension of credit existed in that case, cited the Third Circuit's decision in DiPasquale for the proposition that "section 891(1) is very broad in its application." 237 F.3d at 6. Furthermore, the defendants in Hoyle had relied on Boulahanis, Stokes and Wallace in arguing that there was no extension of credit in that case. The First Circuit held, however, that Boulahanis, Stokes and Wallace "require more than is required in our decision in Sedlak and . . . we decline to give them much weight in this case." Hoyle, 237 F.3d at 6. The Court did note that it "need not reach the question of whether we adopt the Third Circuit's rationale [in DiPasquale] at this time." Id.

Here, in violating the Travel Act by participating in the extortion scheme, the defendant was doing St. Laurent's bidding. The purpose of the scheme was to collect money which St. Laurent claimed was owed to him. The defendant plainly knew this; as already noted, when discussing how to approach one of the intended victims, the defendant stated that they should "smack him and grab him, let's go and it's done. You're dealing with the Saint (a reference to St. Laurent) so you're paying now and

that's it." Indeed, the defendant himself could have been charged with violating § 894, as St. Laurent himself was. In contrast, there is no evidence that the extortion scheme would have obstructed commerce, as the Hobbs Act (18 U.S.C. § 1951(a)) plainly requires. For all of these reasons, the government submits that § 894's base offense level of 20 should apply.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Peter F. Neronha

PETER F. NERONHA
Assistant U.S. Attorney
RI Bar No. 5327
U.S. Attorney's Office
50 Kennedy Plaza - 8th Fl.
Providence, RI 02903
Tele: (401) 709-5000
FAX: (401) 709-5001
peter.neronha@usdoj.gov

Dated: January 8, 2008

Certificate of Service

I hereby certify that on the 8th day of January, 2008, I caused a copy of the within "Government's Memorandum in Response to Defendant's Objection to Pre-Sentence Report" to be served by way of the Electronic Case Filing System upon Timothy E. Morgan, Esquire, counsel for the defendant, 33 College Hill Road, Suite 15G, Warwick, Rhode Island 02886.

/s/ Peter F. Neronha
PETER F. NERONHA
Assistant U.S. Attorney
RI Bar No. 5327
U.S. Attorney's Office
50 Kennedy Plaza - 8th Fl.
Providence, RI 02903
Tele: (401) 709-5000
FAX: (401) 709-5001
peter.neronha@usdoj.gov